A. J. D. THURSTON et al. *v*. UNIVERSITY OF NORTH CAROLINA.

ADVERSE POSSESSION. *Assurance of title.* A partition of specific lands, under a general devise by will of all the residue of the testator's estate, real and personal, made in writing by persons especially authorized by the will, is an assurance of title, within the Code, sec. 2763, which will vest the parties with a good title to their allotments by adverse possession for the time prescribed.

FROM GIBSON.

Appeal from the Chancery Court at Humboldt. JOHN SOMERS, Ch.

A. W. CAMPBELL and JONES & CARTHEL for Complainants.

H. T. JOHNSON and S. W. COCHRAN for Defendants.

COOPER, J., delivered the opinion of the Court.

The University of North Carolina, on the 26th of May, 1869, brought an action of ejectment against the complainants for the land in controversy.

On the 13th of March, 1872, this bill was filed to set up a supposed lost deed for the land from

33—VOL. 4.

the University to Samuel Dickens, under whom the complainants claim, to have the right of the complainants to the land declared, and to perpetually enjoin the action at law.

On final hearing, the Chancellor gave a decree in favor of the complainants, and the defendant appealed.

Prior to the year 1824, the State of Tennessee, on warrants of the State of North Carolina, had granted to the University of North Carolina, many thousand acres of land, in separate grants, in the district of West Tennessee. Among other grants was a grant dated the 9th of October, 1821, for 640 acres in the 10th District, Range 2, Section 11 of Gibson County. The University had employed Samuel Dickens to take charge of the location of the warrants and sale of the lands, and prior to the year 1835 he seems to have sold and satisfactorily accounted for lands to the value of nearly $200,000.

In 1835, the University appointed Charles Manly and Samuel Dickens its agents and attorneys in fact to sell the residue of said lands, and it appears from a report of Charles Manly to the University, which is made an exhibit to the answer, that these agents did sell the residue of said lands on or before the 21st of November, 1835. This report shows that Manly was authorized to ascertain "the tracts of land sold and those remaining to be sold," and to make a settlement with Samuel Dickens, and that he did make the settlement and

ascertain and report the lands unsold, which were afterwards sold under the power. The tract of 640 acres above mentioned is not included in the list of unsold lands. The land in controversy constitutes a part of the land covered by this grant.

In the year 1840 Dickens died, leaving a will which was admitted to probate in September of that year. By that will, after making certain specific devises and legacies, he directs, "all the residue of his lands and real estate" to be equally divided between his children, they accounting for advancements, and he appointed three persons by name "to make all and every necessary division pursuant to the will," and provided that "their acts and doings, or the acts and doings of either two of them," should be binding on all parties concerned. In pursuance of the will, the parties themselves agreed upon a division of the lands in writing, by which the · 640 acre tract of land, granted as above and treated as a part of the estate of Samuel Dickens, was allotted to Elizabeth R. Belote, one of his daughters. The testator had, by his will, appointed trustees to hold the lands devised to this daughter in trust for her "and her children present and future." Two of the persons authorized by the will to make the partition of the testator's lands, on the 25th of December, 1841, ratified and confirmed the partition agreed upon by the heirs, the share of Elizabeth R. Belote being given to the trustees named by

the will, " in trust for the use and support of Elizabeth R. Belote and her children."

The partition thus made was acknowledged by the two Commissioners who had made it under the powers conferred by the will, and registered in several counties in West Tennessee, in which some of the lands lay, though not, it seems, in Gibson County.

Mrs. Belote went immediately into possession of the land by a tenant, who, as early as 1842, built a house upon a part of the land, and resided therein, and cultivated the cleared land, consisting of from fifteen to thirty acres, continuously for seven or eight years. He was succeeded without interruption of possession by other tenants from year to year for several years.

The testimony leaves no doubt that from 1842 to 1852, inclusive, the land was continuously occupied by a succession of tenants holding under Mrs. Belote and her children, the land being known as the Belote land. There is evidence tending to show the continuous occupation of the same cleared land under the Belote children and those deriving title from them, down to the commencement of the action of ejectment, but there is more conflict in the testimony for the subsequent years, and the possession as proved would not have the importance of prior possession, by reason of a new partition of the land among the Belote children. This partition was made on the 15th of September, 1852, by dividing the land into three

tracts, the improvements and cleared land being embraced in only one of these tracts.

The complainants claim two of these allotments under the children, to whom the allotments were made.

The fact that the agent of the University reported that he had ascertained in 1835 all the lands belonging to the University which remained unsold, and had sold the same, giving a detailed list of the lands, which did not include the tract in controversy, and the further fact that the tract was known as the Dickens land in the life time of Dickens, are persuasive of the truth of the complainants' theory that Dickens held the land by a deed from the University, which has been lost.

The report of Manly shows what might well be presumed, that the University had a list of all its warrants and grants, and if the grant of the land in controversy, or the warrant on which it was based, had been placed in the hands of Dickens and never accounted for, the fact could readily have been established. Conceding, however, that there is not sufficient in this record to prove that there ever was a conveyance from the University to Dickens, the rights of the parties turn upon the question whether the title of the University has been divested by the continuous adverse possession of the land by those under whom the complainants claim for the period, and under an assurance of title sufficient to produce that result under our statute of limitations.

By the Code, sec. 2763: "Any person having had, by himself or those through whom he claims, seven years' adverse possession of any lands, tenements or hereditaments, granted by this State or the State of North Carolina, holding by conveyance, devise, grant or other assurance of title, purporting to convey an estate in fee, without any claim by action, at law or in equity, commenced within that time and effectually prosecuted against him, is vested with a good and indefeasible title in fee to the land described in his assurance of title."

If the will of Dickens had expressly designated the land in controversy, and devised it in fee as part of his estate, the devise would, by the very words of the section, have been an assurance of title sufficient to vest an indefeasible title, by an adverse possession of seven years: *Cox* v. *Peck,* 3 Yer., 435. The possession of any part of the land for the requisite period, under a sufficient assurance of title, gives an indefeasible title to the extent of the boundaries therein named. And, since 1784, it has been provided by statute that every devise shall convey the entire estate of the testator in the lands unless the contrary intent plainly appears from the words and context of the will: Code, sec. 2164.

A devise of all the testator's lands, or of the residue of his lands would be good without naming them: *Williams* v. *Williams,* 10 Yer., 20 *Countess of Bridgewater* v *Bolton,* ₁ Salk., 236; *Jackson* v.

*Delany*, 11 Johns., 365. Such a devise would carry a possessory estate: *Marr* v. *Gilliam*, 1 Cold., 488, *Baker* v. *Hale*, 6 Bax., 50.

The will unquestionably gives to Elizabeth R. Belote and her children, or rather the trustees who hold for them, the fee in the land devised for the benefit of the daughter and her children. The partition, which purports to be made in accordance with and under the power conferred by the will, must be held to pass the same inierest.

A decree of a competent Court for partition is an assurance of title within the meaning of the statute: *Duncan* v. *Gibbs*, 1 Yer., 236. Even if it do not divest and vest title: *Johnson* v. *Britt*, 9 Heis., 756. The reason is, however, that the parties hold their parcels in severalty by the same title that they held the land in common.

A deed or agreement for partition voluntarily entered into by the parties would be equally efficacicus for the same reason, although it did not in legal terms vest each parcener with a fee.

The question before us, then, is narrowed down to this: does a partition of specific lands among devisees, made under a will, which gives each devisee a fee in the lands devised, constitute an assurance of title, under the statute, to the lands mentioned therein, although the testator had, in fact, no title; or, at most a mere possessory title to the land?

A Sheriff's deed, founded on a void tax sale, is such an assurance of title: *Love* v. *Shields*, 3 Yer.,

405. So is a deed void, and inoperative in its inception: *Vance* v. *Johnson*, 10 Hum., 214; *Hunter* v. *O'Neal*, 4 Bax., 494. So is a deed founded on a void decree: *Whiteside* v. *Singleton*, Meigs, 224. So is a fraudulent deed: *Gray* v. *Darby*, M. & Y., 396; *Clark* v. *Chase*, 5 Sneed, 636. Whether fraudulent in law or fact: *Blantire* v. *Whitaker*, 11 Hum., 313. So, says Judge Caruthers, is a forged deed: 5 Sneed, 638. And it is not necessary that the deed should be registered: *Stewart* v. *Harris*, 2 Swan, 656. Continuous adverse possession is the important point, the written instrument, purporting to convey an estate in fee, being necessary to fix the extent of the land to which the title may thus be acquired.

There is nothing to impugn the good faith of the parties in this case. The land was, beyond doubt, supposed by the devisees, and the porsons empowered by the will to make the partition, to belong to the testator. Whether it did in fact belong to him by any assurance of title cannot now be shown. The instrument of partition is neither forged. nor fraudulent. Even if inoperative in its inception, or founded on a will ineffective as to the land in controversy, it, when taken in connection with the will, purported to convey an estate in fee. No reason occurs why it should not. be as effective to fix boundaries as the other instruments mentioned, equally invalid and far more objectionable in morals.

The defendant has slept upon its rights, until

innocent parties have become interested, and may justly claim the benefit of the law. The objection to the introduction of the copy of the instrument of partition of 1841 as evidence is not well taken. The loss of the original is shown, and it was competent to prove its contents by the next best evidence.

The probate was sufficient to authorize its registration in any county in which any part of the lands lay, and it was so registered in several counties. A certified copy of the instrument as thus properly registered was the best evidence of its contents.

There is no error in the Chancellor's decree, and it must be affirmed, with costs.